UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 2:23-cr-00108-wks-2 |
| ) | |
| JEREMY WHITE, ) | |
| Defendant ) | |

MR. WHITE'S SENTENCING MEMORANDUM

Mr. White submits this memorandum to explain the offense conduct, the sentencing guidelines' applications to the case, and his history and characteristics. He submits that considering all that the appropriate sentence is in the area of 84 months imprisonment, and that that term would meet the "sufficient but not greater than necessary" measure in 18 U.S.C. § 3553(a).

Mr. White is a young man, just 22-years-old, who was heavily involved in drug distributing in Vermont. He worked with several others in a group that found and developed a market in the Brattleboro, Vermont area. Mr. White's family in Connecticut had been involved in drug sales since he was young. Selling drugs was pretty much *the* job training and schooling he has known. Despite that, he has no criminal history points.

Mr. White pled guilty to distributing drugs and to possessing a gun in connection with drug sales. He admitted that conduct. He accepts responsibility for the harm that his conduct has caused people in Vermont, and society as a whole. He disagrees, though, with the government's view he was an actor "bigger" even than Linoshka Barbosa and all the other participants in the Brattleboro group. The Probation Office apparently adopts that government view—based on Ms. Barbosa's own statements.

1

Mr. White explains that he realizes a significant imprisonment sentence is warranted, but one much less than the guidelines in the presentence report would call for. A sentence that essentially "incapacitates" Mr. White by ensuring that he will not be a young man when discharged is not warranted. He is still at a point at which he can learn job skills, get his high school diploma or its equivalence, learn how to positively contribute to society – and then be discharged to do just that. He *can* turn things around.

**The Sentencing Guidelines.**

According to the presentence report (PSR) the sentencing guidelines imprisonment range is 270 to 300 months. That is calculated by the total offense level being 37 and the criminal history category I. If the Court treats cocaine base as cocaine powder, that is, as "1:1", the total range would be 228-270 month. Mr. White disagrees with parts of the PSR's application of the guidelines, and he explains that below.

<u>Time in custody—no disciplinary violations</u>

Mr. White has been in custody for more than twenty months as of June 25, 2025. He has had no disciplinary violations, it appears, despite being detained in several facilities (Strafford County in New Hampshire, Northwest State in Vermont, Cheshire County in New Hampshire, and Wyatt in Rhode Island.) This shows that Mr. White can stay out of trouble and avoid problems. It speaks volumes about his ability to do well once he is discharged from the Court's sentence.

**The offense conduct, under 18 U.S.C. § 3553(a)**

Mr. White acknowledges that the extensive drug trafficking he was a significant part of contributed to the ravaging destruction of lives in Vermont caused by drug use. He accepts responsibility for his role and actions, and he regrets his involvement.

*A note as to drug quantity in the PSR, regarding the number of bags of "heroin/fentanyl"*

In one place in the presentence report a "box" of heroin/fentanyl is described as 500 bags, and in another a "box" is described as 1000 bags. The actual number of "bags" in a "box" is an open question apparently. See footnotes eight and 10 on pages 13 and 14 in the presentence report, pertaining to PSR paragraphs 66 and 72.

*Mr. White's assertion about a "hierarchy" in the group*

He disputes Ms. Linoshka's picture that Mr. White was "above her" in the drug trafficking operation. Out of all the people who described to law enforcement how the organization operated and who the leaders were, *only Ms. Linoshka Barbosa describes Jeremy White as being "over" Ms. Barbosa*. Every other person describes Linoshka Barbosa being at the top as they could see it, with Mr. White being part of the operation that brought drugs from Connecticut to the Barbosa operation in Vermont.

**A look at the relative roles of Linoshka Barbosa and Jeremy White**

The presentence report relies on Ms. Barbosa's statement that "everything had to run through Jeremy White." (Barbosa statement, according to the presentence report, page 13, paragraph 63.) She made that statement while talking to law enforcement officers. "[I]nvestigators indicated [to L. Barbosa] that law enforcement *viewed L. Barbosa as the primary operator* of the organization while she was staying in Vermont. L. Barbosa denied being in charge, stating that she had a 'big mouth' but that everything had to go through Jeremy White." PSR ¶63. Her statement came when she was trying to minimize her own involvement and to make someone else—White, here—"larger" than her. However, several people who discussed the operation with law enforcement make it clear that Jeremy White was not above Ms. Linoshka Barbosa in the operation. Here are excerpts relevant, with italics added.

3



The government's sentencing memorandum in the Linoshka Barbosa case demonstrates its view of Ms. Barbosa's top role.

> The Hartford group had numerous suppliers including Gina Colon a.k.a. "Chunga" (Angel Cruz's mother) and Leonard White Sr. (Jeremy White's father). Zoquia Barbosa, Linoshka Barbosa's mother, was also involved in securing product for the group and would assist Barbosa in maintaining and laundering the drug proceeds.
>
> While Barbosa did return to Hartford for periods of time during the conspiracy, the evidence case, including the statements of witnesses, indicate that it was Barbosa, not anyone else, who led the drug conspiracy in Vermont.

(Gov't. memorandum, Doc. 240.)

It was Linoshka Barbosa who wanted and obtained guns, too—not Jeremy White. Again from the government's memorandum in Linoshka Barbosa's case:

> On November 16, 2022, ATF investigators interviewed the Hinsdale purchasers about the Glocks and those interviews revealed that a person by the name of "Lily" or "Lilz" a.k.a. Linoshka Barbosa, was selling drugs in Brattleboro and enlisting drug users to buy guns for her. Barbosa would give the user cash to pay for the guns and once the user returned to her with the guns, Barbosa would also give them drugs.

(Gov't. memorandum, Doc. 240.)

**Objection to the +4 enhancement under USSG 3B1.1**

Mr. White also objects to the assertion that Mr. White's involvement rose to the +4 levels as under USSG 3B1.1. First, he objects to this "role in the offense" assessment being based on the statement of the codefendant Ms. Barbosa. Second, he objects based upon the statements of people who talked with law enforcement, described immediately above here.

Mr. White realizes that the government's view is that Linoshka Barbosa managed the group's activities in Vermont and that Jeremy White managed the Connecticut supply aspect and was also the "overall" leader. However, the record here, that is, in the PSR, does not support that theory.

Mr. White *agrees* that he was *an organizer, leader, manager, or supervisor in this drug trafficking,* but he asserts that he was: (1) not an organizer or leader of five or more participants. And he was (2) not a manager or supervisor of activity involving five or more participants. The quotes from the proffers shows that many people in the group were leaders in their own rights and were not managed by Jeremy White. He asserts that the enhancement under 3B1.1 should be +2 and not +4.

**Mr. White's history and characteristics, under 18 U.S.C. § 3553(a)**

Mr. White has never shied away from acknowledging that he was heavily involved in the Brattleboro drug selling group. But it is also clear that he was (and is still) a young man who was essentially brought up into drug dealing from his family, his neighborhood environment, and the lack of "pro-social" opportunities. To present a full picture of all this, the defense retained a psychologist, Dr. Claire Gilligan, to conduct a psychological evaluation of Mr. White. And she wrote a report. See **Exhibit A,** Dr. Gilligan report.[1] We asked Dr. Gilligan to assess Mr. White for these purposes:

> Mr. Desautels requested this evaluation to assist with mitigation for Mr. White's sentencing hearing. He requested that I assess Mr. White's mental health, assess how his early history impacted his life trajectory and current functioning, and provide treatment recommendations.

Dr. Gilligan made these findings.

> Mr. White, a Black male, was born into poverty and raised in Hartford, Connecticut by different family members. As an infant, he was removed from his mother's care due to her mental health issues and subsequently placed with his maternal aunt. He was again moved as a child to reside with another aunt, and then finally returned to his mother's care at age 10.

---

[1] The defense has filed this report separately from the defense sentencing memorandum, with a motion-request that it be filed under seal.

Though he indicated close relationships with his family, he was exposed to family members with mental health issues, drug addictions, and who were involved in criminal behavior. The neighborhood in which he was raised afforded him social opportunities, but his neighborhood was disadvantaged given the presence of violence, drug use and drug dealing, and lower socioeconomic status.

The environment in which he was raised reinforced the normalcy of these, and the expectation that he had to be tough to gain respect and survive. He became a product of this environment, following in the footsteps of family members and neighbors by selling drugs as an adolescent to survive.

He lacked positive role models in his life to help him overcome the adversity of being raised in a marginalized community.

Mr. White is a young man who has barely crossed the threshold into adulthood. His exposure to familial and neighborhood dysfunction impacted his ability to develop healthy views of the world. Instead, he developed the belief system it was normal to engage in criminal behavior to survive. Expectedly, he reported experiencing periods of depression in his past related to the murders of family members.

Mr. White presents as a young, resilient Black man who has the ability to be a productive citizen.
He aspires to graduate high school and engage in any other programming aimed at improving his life while incarcerated. He has maintained a job at Strafford and was recently promoted to a full-time position.

*He has demonstrated a strong work ethic not often observed by his supervisor considering Mr. White's young age. He presents with insight into the need to make changes to his life so he can be the father that he never had.*

Given Mr. White's resiliency, young age, and insight, *he has the capacity to develop into a highly functional and contributing member of society.* He will need support through structure and oversight, access to positive role models, and opportunities to gain vocational and other life-related skills, to succeed upon his release.

Educational History
Mr. White … spontaneously said, "I need a rewind button on life. I know I could do better."

Mr. White discussed he has attempted to obtain additional high school credits while detained, but said his moving frequently to different facilities made it difficult to complete coursework. He expressed his desire to complete high school. He shared that he also wrote a letter to his girlfriend telling her the same so that he [sic] could be a better person.

Employment History
Mr. White discussed he worked in the kitchen at Strafford Correctional and was promoted to warehouse work through Industrial Business, in March 2025. He said he packages hygiene products as well as products for Stone Wall Kitchen. He reported he works from 5am until 12pm Monday to Friday. He has been punctual for his job and has not had any problems. He indicated a desire to be gainfully employed when he is released into the community.

Medical History
He incurred a gunshot wound to his back in 2023, noting that the bullet is still in his chest due to associated risks with removing it.

Mental Health History
Mr. White recalled his mother brought him to see a counselor at The Village as a child, though he did not remember for what. .

He perceived that others would view him as "crazy" if he sought mental health treatment; a view reflective of his need to be "tough" developed during his upbringing.

Substance Use History
Mr. White said he was about 10 years old when his older sister introduced him to alcohol. He was about the same age when he began smoking marijuana, also introduced to him by his sister and other family members… His use increased between ages 14 to 16 recalling he would smoke it "all day." He continued to smoke marijuana frequently until his detainment.

Juvenile Delinquency and Criminal History
Mr. White shared that he also began selling drugs at age 14, noting he was introduced to it from people in his neighborhood. He said, "Drug dealing was all I knew…I could buy whatever I needed."

He discussed that he was approached by his nephew's mother and his younger cousin to sell drugs in Vermont where he could make more money. He viewed them as family, not as business associates. He added that because they were like family, he had a duty to "look out for them" and further said, "We helped each other."

Mr. White reflected that his selling drugs in Brattleboro was "wrong…because I could kill people."

He expressed his desire to get his life back on track upon his release. He stated that his goal is "to be as much as a father to my kids as I can be…try to graduate…work…."

> **Assessment Tools**
> *Depression*
>
> Based on his self-report, Mr. White endorsed experiencing past periods of extended sadness and social isolation related to the murders of family members. This included the murder of two adolescent-aged cousins, one of whom was killed in a drive by shooting. He discussed that a close family friend, a young boy, was also killed by a car. He shared that in hindsight, the murders of his cousins "made me realize you have to take advantage of the moment and love people while you can."
>
> *Posttraumatic Stress Disorder*
>
> Mr. White reported witnessing shootings and experienced being shot at in his neighborhood "countless" times. He viewed it as normal saying, "Duck, get out of the way, and went about your day." He indicated experiencing hypervigilance describing this as "street aware."

**Exhibit A**, italics added.

**Mr. White's history and characteristics --as told by his grandmother and friends.**

    Mr. Lugo wrote eloquently about Mr. White, starting with Mr. Lugo's own story.

> I know firsthand that a person's past does not have to define their future. I was sentenced to 60 years in prison but was released after serving 23 ½ years due to my dedication to self-improvement and rehabilitation. ... I was granted a commutation by the Connecticut Board of Pardons and Paroles (CT BOPP) in recognition of my achievements, and since my release, I have worked hard to reintegrate into society…
>
> I share this because I believe Jeremy White has the same potential to turn his life around. I have known Jeremy and his family for a long time, and I consider them like my own. They are kind, generous people, and Jeremy is no different.

**Exhibit B**, Ruperto Lugo letter.

Ms. Tracy Shumaker wrote a letter that includes this about Jeremy White.

> My name is Tracy Shumaker, and I am a [Case Manager] for Community Partners in Action (CPA) in Hartford, Connecticut. CPA is a nonprofit organization dedicated to criminal justice reform... I work closely with individuals to connect them with resources, develop life skills, and support them in making lasting, positive changes.

> I am also a mother of three and someone who personally understands the power of second chances. I was sentenced to 25 years, but I was granted a commutation and served 19 years and 1 month before my release. My journey has shown me that people are capable of growth and change when given the right opportunities, *and I see that same potential in Jeremy.*
>
> I have known Jeremy through his family for quite some time and have spent time with them on multiple occasions. Through this connection, I have come to see the kind, thoughtful, and genuinely caring person that he is. …he naturally looks out for the people around him. Whether it's with his mother, family, or friends, he pays attention to how others are feeling and does his best to make sure everyone is happy and comfortable. That kind of selflessness speaks to his good heart.

**Exhibit C,** Tracy Shumaker letter.

And Mr. White's grandmother, Ms. Baker, wrote that she will help him as much as she can.

> My name is Antonia Baker, and I am Jeremy's grandmother. I am a wife, a mother of 2, and a grandmother of 13 and a great grandmother of 5. I am also the youth pastor at my church of which I've been with for 40 + years.
>
> The way that I can support Jeremy when he is released is to be here for him emotionally and spiritually. I can also help him find work.

**Exhibit D,** Ms. Baker letter.

**The need to avoid unwarranted disparity (18 U.S.C. sec. 3553(a)(6))**

The sentencing ranges of codefendants are in the PSR at page 5, para. 10. Mr. White acknowledges that his sentence should be higher than that of Messrs. Nathan Delgado, Jason White, and Steven Holway, but he believes it should be significantly lower than Linoshka Barbosa's.

**Request for a downward variance from the sentencing guidelines**

1. **He asks that the Court vary downward in base offense level because of the disparate treatment between powder cocaine and crack cocaine.**

The government, in the plea agreement, agreed to not oppose a downward variance for this. If the Court grants this, the guideline range would be 168 to 210 months on the drug

10

trafficking count and a consecutive 60 months on the 18 USC 924(c) count. However, Mr. White asserts that the guidelines imprisonment range should be lower than that, because he asserts that a role enhancement should be +2, rather than +4. Thus, the guidelines would be:

**Base offense level 34**

        <u>+2 for role</u>

        36

Acceptance   - 3

Total level   33      Criminal history category I (Zero points)

**Guidelines imprisonment range: 135-168 (on the drug trafficking count)**

    **2. Mr. White asks that the Court apply a downward variance from the guideline range because:**

(1) His upbringing was such that he was exposed to crime, violence, drug trafficking at an early age, including among by his father, and

(2) His early exposure to all those activities influenced him significantly before he was old enough to make mature decisions about his own life.

(3) He has no criminal history.

**Open cases in Connecticut might punish Mr. White for some of the same conduct for which he is being sentenced in the federal District of Vermont.**

The presentence report notes at page 2 of the cover page indicating a detainer out of the Judicial District of Hartford, Connecticut, docket number 23-20 4634. That Connecticut case seems to include some of the same conduct that Mr. White is charged with committing in Vermont; that is, the trafficking drugs from Connecticut, some of which stayed in Connecticut and some of which were brought to Vermont. Mr. White asks the Court to consider the

11

likelihood of another sentence being imposed in Connecticut as a factor in the sentence here. Otherwise, there is a real possibility of his being punished twice for the same conduct.

**The sentence requested.**

He asks that the Court impose a sentence of 84 months imprisonment, and a term of supervised release.

**Conclusion**

For all the above reasons, Mr. White asks the Court to impose a sentence of 84 months imprisonment and a period of supervised release.

June 27, 2025

*/s/ Michael L. Desautels*
Michael L. Desautels
Office of the Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, VT 05401
Ph: (802) 862-6990
Email: Michael_Desautels@fd.org
Attorney for Jeremy White
